IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TEAMSTERS LOCAL UNION<br>No. 926, a/w INTERNATIONAL<br>BROTHERHOOD OF TEAMSTERS,<br><br>                Plaintiff<br><br>     vs.<br><br>KELLOGG SALES COMPANY,<br><br>                Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)  No.<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

The Plaintiff, Teamsters Local Union No. 926 (hereinafter "Local 926"), brings this action for breach of contract against the Defendant, Kellogg Sales Company (hereinafter "Kellogg"), as follows:

**JURSIDICTION AND VENUE**

1.  This is an action pursuant to §301 of the Labor-Management Relations Act ("LMRA"), Title 29 U.S.C. §185, seeking declaratory and compensatory relief as the result of Kellogg's breach of an agreement reached between the parties.

2.  Jurisdiction is founded upon 29 U.S.C. §185(c) and 28 U.S.C. §1331.

3.  Venue is appropriate in this District pursuant to 29 U.S.C. §185(a) and 28 U.S.C. §1391(b)(2) because Kellogg at all times material herein maintained a place of operations within this District and conducted business throughout this District, Local 926 maintains its office and

represents employees of various employers located within this District, and because a substantial part of the events or omissions giving rise to Local 926's claims occurred within this District.

## THE PARTIES

4. The Plaintiff, Local 926, is an unincorporated labor organization organized and existing for the purpose of representing employees of employers engaged in interstate commerce. Local 926 maintains its office and principal place of business at 625 Stanwix Street, Suite 1804, Pittsburgh, Allegheny County, Pennsylvania. Local 926 represents employees of various employers located within this District. Local 926 is a "labor organization" as that term is defined in 29 U.S.C. §152(5).

5. The Defendant, Kellogg, is a corporation organized and existing under the laws of the State of Delaware. Kellogg maintains its principal office at One Kellogg Square, Battle Creek, Michigan, 49016, and at all times material herein also maintained a place of business at 102 Technology Drive, Moon Township, Allegheny County, Pennsylvania, 15275. Kellogg is an "employer" as that term is defined in 29 U.S.C. §152(2) and is engaged in the manufacture and distribution of baked snacks and cookies in an industry "affecting commerce" as that term is defined in 29 U.S.C. §152(7).

6. At all relevant times herein Kellogg employed "employees" as defined in 29 U.S.C. §152(3) at its distribution facility located at 102 Technology Drive, and Local 926 was the exclusive collective bargaining representative of a bargaining unit of approximately fourteen (14) of Kellogg's employees employed as at 102 Technology Drive. The employees in the bargaining unit were employed as delivery drivers and delivered products manufactured by

Kellogg to customers located throughout Western Pennsylvania and parts of West Virginia, Ohio, Maryland and New York.

## **THE FACTS**

7. On or about July 1, 2009, Local 926 and Kellogg entered into a collective bargaining agreement for the purpose of establishing wages, hours and other terms and conditions of employment for the bargaining unit of Kellogg's employees employed at 102 Technology Drive and represented by Local 926. The term of that collective bargaining agreement is effective by its terms from July 1, 2009 through June 30, 2012 (hereinafter the "2009-2014 CBA").

8. On or about February 21, 2012, Kellogg announced to Local 926 that it intended to close its Pittsburgh distribution center. At the same time, Kellogg announced that it would also close its Akron, Ohio distribution center, where the employees were represented by Teamsters Local Union No. 52 (hereinafter "Local 52"). Kellogg announced its intention to transfer the work being performed at the Pittsburgh and Akron locations to a new distribution center in Warren, Ohio. Kellogg initially announced that it anticipated closing the Pittsburgh distribution center on June 13, 2012 and the Akron distribution center on July 13, 2012. In connection with the anticipated closing of the Pittsburgh location, Kellogg informed Local 926 that the bargaining unit employees would be permanently laid off at the time of the closing.

9. Local 926 instituted grievances challenging Kellogg's right to unilaterally transfer the Pittsburgh bargaining unit work and discharge the employees represented by Local 926. Local 52 instituted similar action in regard to the announced closing of the Akron facility.

10. On or about April 2 and 16, 2012, representatives of Kellogg and Locals 52 and 926 met in Cleveland, Ohio for the purpose of addressing the various issues created by Kellogg's announcement of the plant closings and terminations. The discussions during those meetings produced an agreement of the parties that was reduced to a written memorandum titled "Understanding between Teamsters Local 52, Local 926 and Keebler Company – Monday, April 16, 2012", a true and correct copy of which is attached hereto and incorporated herein (hereinafter the "Memorandum of Understanding").

11. The goal of Local 926 in the discussions that produced the Memorandum of Understanding was to persuade Kellogg to consider an alternative to its plant closing whereby Kellogg would maintain a satellite operation in Pittsburgh for distribution of product to areas south and east of Pittsburgh. Local 926 considered this goal to be the most expeditious way to maintain employment for at least some of its members within the economic framework identified by Kellogg.

12. During the discussions that took place on April 2 and 16, 2012, Local 926 presented a plan to Kellogg whereby Kellogg would maintain a satellite operation in southwestern Pennsylvania. This plan would have permitted some of the Local 926 members to remain employed by Kellogg under the terms of the 2009-2014 CBA. Under the proposal, product would be delivered from the Warren distribution center to a transfer point in Pittsburgh, where Local 926 members would then pick up the product and deliver to the areas south and east of Pittsburgh. Kellogg delivery vehicles servicing the areas south and east of Pittsburgh would have had to pass through the Pittsburgh area. The members so employed would have continued to receive wages and benefits under the 2009-2014 CBA.

13. Kellogg expressed its interest in pursuing the transfer-station alternative if it was economically and operationally feasible. At the same time, Kellogg and Local 52 focused their attention on the issues of greatest concern to Local 52, which included permitting Local 52's members to follow their work to Warren.

14. In response to Local 926's proposal to maintain a satellite operation in Pittsburgh, Kellogg proposed language whereby Kellogg would agree to "strongly review" Local 926's proposal for a satellite operation in Pittsburgh. Kellogg also proposed language that stated that if Kellogg made the determination that the satellite proposal was not feasible Kellogg would provide Local 926 with the business rationale underlying that determination. Relying solely and exclusively on this representation by Kellogg, Local 926 agreed to the terms of the Memorandum of Understanding. The parties executed the Memorandum of Understanding on April 16, 2012.

15. The Memorandum of Understanding provides in relevant part:

*[Kellogg] agrees to strongly review the recommendation of the union to consider a TSA location in the Pittsburgh area and provide an answer to this request no later than April 27, 2012. [Kellogg] will provide the union with the business rationale if this cannot be done. If this is considered not to be a viable option by [Kellogg], the parties agree to enter into "Effects" bargaining.*

16. Thereafter Local 926 and Kellogg met on May 17, 2012. At that time, Darin Torosian, Kellogg's Director of Labor Relations, informed Local 926 that the proposal for a satellite operation (referred to as a "TSA" in the Memorandum of Agreement) had been rejected by Kellogg. Torosian informed the Union that the proposal for the TSA did not "make economic sense" because of the additional miles/resources/vehicles that would be required. Torosian

stated only that the TSA would cost between $280,000 and $300,000 annually in additional costs and therefore it wouldn't work out, without providing any specific explanation of the figures.

17. Upon hearing Kellogg's rejection of the TSA proposal in the May 17, 2012 meeting, Local 926 reiterated its earlier-expressed concern that Kellogg would, by closing the Pittsburgh facility and terminating the employees, become liable for a pension withdrawal liability in the amount of $2.5 million. Local 926 then stated that Kellogg had not even contacted the pension fund office to inquire about whether maintaining a certain level of employment in the TSA would forestall the withdrawal liability. Local 926 further pointed out that if Kellogg had not even taken this elemental step in evaluating the TSA there was no basis to believe that Kellogg had lived up to its promise to "strongly review" Local 926's proposal. Local 926 challenged Kellogg to provide information that would live up to its contractual promise to strongly review the proposal and provide a business rationale if the proposal was rejected, but Kellogg failed or refused to do so.

18. By letter dated May 17, 2012, Paul "Dino" Taormina, Business Representative for Local 926, informed Torosian that Local 926 considered Kellogg to be in breach of the Memorandum of Understanding by failing or refusing to properly consider the TSA proposal. Taormina requested that Kellogg provide the information that was utilized or considered in evaluating the TSA proposal.

19. Kellogg never provided any additional information beyond the information described in Paragraph 16 above. Kellogg never demonstrated that it had strongly reviewed the proposal, and Kellogg never provided any valid explanation for its claim that the proposal was not operationally or economically feasible. Had Kellogg undertaken a good-faith effort to examine the proposal, the result would have been either (1) to establish a satellite operation

employing Local 926 members, or (2) to establish that such a venture was not feasible, thereby establishing a basis to enter into effects bargaining. Local 926 believes and therefore avers that Kellogg breached its contractual promise to strongly review the TSA proposal and provide Local 926 with a sufficient explanation of the business rationale as to why the TSA proposal was not feasible. As a result, Kellogg is in material breach of the Memorandum of Understanding.

### COUNT ONE – BREACH OF CONTRACT

20. The Memorandum of Understanding is a contract between an employer and a labor organization as that term is used in Section 301(a) of the LMRA.

21. Local 926 and its members employed at Kellogg have been harmed by Kellogg's breach. Local 926 relied on the promise made by Kellogg to enter into the Memorandum of Agreement. By failing to "strongly review" the proposal for a TSA and by then failing to provide the business rationale for that decision, Kellogg has deprived Local 926 and its members of the benefit of the bargain created by the Memorandum of Understanding.

22. Due to Kellogg's breach of the Memorandum of Understanding, the Local 926 members employed at Kellogg were deprived of the opportunity for continued employment under the terms of the 2009-2014 CBA. Each member of the bargaining unit represented by Local 926 was damaged by the decision of Kellogg to discharge their employment rather than to give the required consideration to the proposal that would have kept some or all of those employees working.

WHEREFORE the Plaintiff, Local 926, hereby requests this Court to enter judgment in its favor and against the Defendant, Kellogg, and Local 926 further requests this Court to (1)

compensate its members for the damages sustained by each of them resulting from Kellogg's breach of the Memorandum of Understanding in an amount to be determined more particularly at trial, and (2) award to Local 926 its reasonable attorneys' fees and costs in pursuing this action, and (3) such other relief as may be just and proper.

                Respectfully submitted,

                JUBELIRER, PASS & INTRIERI, P.C.

                BY:  /s/ Robert A. Eberle
                      Robert A. Eberle, Esquire
                      Pa. I.D. #47359
                      219 Fort Pitt Boulevard
                      Pittsburgh, PA 15222
                      412-281-3850
                      412-281-1985 (fax)
                      rae@jpilaw.com
                      Attorney for Defendant